IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of: | ) | No. 37830-6-III |
| | ) | |
| NANCY ANN BEVILACQUA-<br>MADRIGAL, | ) | |
| | ) | |
| Respondent, | ) | UNPUBLISHED OPINION |
| | ) | |
| and | ) | |
| | ) | |
| EDUARDO GUADALUPE MADRIGAL, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Eduardo Madrigal appeals after the trial court denied

his CR 60(b)(11) motion to vacate a default dissolution decree and associated final

orders. Because Mr. Madrigal failed to show that the property award and the parenting

plan were based on incomplete, incorrect, or conclusory information, we affirm.

FACTS

Nancy Bevilacqua-Madrigal and Eduardo Madrigal were married in 2007. In

April 2019, Ms. Madrigal filed an amended petition for dissolution of marriage. In her

amended petition, she requested the court enter a parenting plan giving her primary

residential placement of the parties' seven-year-old son, J.M, and limiting Mr. Madrigal's visitation and decision-making. Her request was supported by a declaration accusing Mr. Madrigal of using and selling illegal drugs, and of assaulting and threatening her and their son. She noted she had a permanent protection order and asked the court to enter a protection order for her son. Her accusations were confirmed by sworn statements from her father and adult children and, more notably, by a detailed handwritten sworn statement from a woman who had known the couple for seven years. In that statement, the woman confirmed that Ms. Madrigal and J.M. often stayed with her for their own safety, and that J.M. was terrified of his father, had nightmares, and believed his father would kill him and his mother. The woman's statement concluded by saying she would be at the hearing if the court wanted to ask her questions.

Mr. Madrigal responded by requesting standard visitation and joint decision-making. In a declaration, he portrayed himself as the responsible parent, accused Ms. Madrigal of being unfaithful, and accused her adult children of repeatedly using illegal drugs in the family home.

The trial court heard argument on April 8, 2019. Although it did not enter a temporary parenting plan, it did enter an order restraining Mr. Madrigal from harassing or having any contact with Ms. Madrigal until 2099 and J.M. for one year.

In late February 2020, Ms. Madrigal requested renewal of the one-year restraining order that protected J.M. In her supporting declaration, she noted that Mr. Madrigal had failed to obtain a court-ordered hair follicle test and court-ordered counseling. She also informed the court that Mr. Madrigal had three warrants out for his arrest and had repeatedly violated the restraining order, resulting in over 10 police reports. Mr. Madrigal did not appear for the March 9, 2020 hearing, but his attorney did. After argument, the trial court extended the restraining order to protect J.M. for an additional year.

Mr. Madrigal never filed an answer to Ms. Madrigal's dissolution petition. In late July 2020, Ms. Madrigal moved for an order of default and noted her motion for August 17. Counsel for Mr. Madrigal filed a notice of intent to withdraw, with a withdrawal date of August 27. At the August 17 default hearing, counsel for Mr. Madrigal explained he had attempted to reach his client but was not successful. The trial court entered the default order. The order included the following warning: "The court may sign orders and hold hearings in this case without notice to the defaulted party." Clerk's Papers (CP) at 31. There was no objection to this language.

On August 18, the court administrator provided Ms. Madrigal's counsel a date of September 9, 2020, to present evidence for the final orders. Counsel filed notice of the September 9 hearing with the court.

Also on August 18, Mr. Madrigal called his attorney and told him that he had returned to Washington. He had been in Mexico for several months, and once he returned to Ellensburg in late June 2020, he was arrested for failing to comply with court orders and was incarcerated for 20 to 30 days.[1] Once Mr. Madrigal called his attorney on August 18, the latter filed a notice of appearance and provided a copy of that notice to opposing counsel.

Ms. Madrigal testified at the evidentiary hearing, and the court admitted a letter from J.M. In conjunction with the final dissolution decree, the court entered findings of fact and conclusions of law about the marriage, including a finding "that there has been significant domestic violence in this household." CP at 42.

The property award gave Ms. Madrigal the family home—a duplex co-owned with Ms. Madrigal's father. Ms. Madrigal testified that the marital equity in the duplex was

---

[1] In his motion to set aside the dissolution decree and final orders, Mr. Madrigal failed to explain why he could not have kept in contact with his attorney while he was in Mexico, or upon his arrest and incarceration in Ellensburg, or even after his release. Instead, he simply says he did not own a phone and it took him weeks after being released to get one. A person does not need to own a telephone to make a telephone call.

$15,000. The award offset this equity by assigning to Ms. Madrigal just over $15,000 of credit card debt. In addition, the award assigned to Ms. Madrigal the debt for each asset awarded to her.

The parenting plan prohibited Mr. Madrigal from having contact with J.M. The reasons for this were Mr. Madrigal's physical and repeated emotional abuse of J.M., domestic violence and assault in the home, Mr. Madrigal's long-term emotional problems and substance abuse that interfered with his ability to parent, few or no emotional ties with J.M, and his use of conflict in a way that endangered or damaged J.M.'s psychological development. The court entered a third restraining order, restraining Mr. Madrigal from any contact with J.M. for one year.

On September 14, Mr. Madrigal called his attorney because he learned that final papers had been entered. On September 22, Mr. Madrigal, citing CR 60(b)(11), moved to vacate the dissolution decree and the associated final orders. He argued that it would be inequitable not to vacate the decree and associated final orders because (1) he had $60,000 of equity in the duplex but was assigned the duplex debt, and (2) the parenting plan deprived him of all contact with J.M.

The superior court received briefing from the parties and held a hearing. It later issued a letter ruling denying Mr. Madrigal's motion. In relevant part, the ruling stated:

"Through his own inexcusable neglect [Mr. Madrigal] failed to keep in contact with his attorney and the case moved along without his participation." CP at 105. The trial court entered its order denying Mr. Madrigal's motion to vacate, and Mr. Madrigal timely appealed.

## ANALYSIS

A.    FILING A NEW NOTICE OF APPEARANCE DID NOT ABROGATE THE COURT'S PRIOR DEFAULT ORDER

Mr. Madrigal contends his attorney's new notice of appearance should have alerted the trial court that he wanted to participate in the default evidentiary hearing. But even if it did, we conclude the trial court was not required to give Mr. Madrigal notice of the hearing.

When a party "has been adjudged to be in default, he is not entitled to notice of subsequent proceedings." *Conner v. Universal Util.*, 105 Wn.2d 168, 172, 712 P.2d 849 (1986) (citing *Pedersen v. Klinkert*, 56 Wn.2d 313, 320, 352 P.2d 1025 (1960)); *see also* CR 5(a). The reason for this is simple: "'After default a defendant cannot be heard to contest the subsequent proceedings, and certainly it would be a useless thing to require notice of such proceedings to be served upon him.'" *Pedersen*, 56 Wn.2d at 319 (quoting *Gen. Lithographing & Printing Co. v. Am. Trust Co.*, 55 Wash. 401, 403, 104 P. 608 (1909)). The *Pedersen* court examined three prior cases in which appellants, against

whom an order of default has been entered, argued that they were entitled to notice before a judgment could be entered against them. *Id.* at 318. It noted that "[i]n each instance we held that the appellants, being in default, were not entitled to notice of the entry of judgment against them." *Id.*

Consistent with these authorities, the trial court's default order warned, "The court may sign orders and hold hearing in this case without notice to the defaulted party." CP at 31. An attorney's new notice of appearance is insufficient to abrogate a court's default order. The procedure for abrogating a default order or judgment is well known: one must timely bring a motion to set aside the default order or judgment, and establish "good cause" for doing so. *See* CR 55(c)(1).

B.    DENIAL OF MOTION TO VACATE WAS WITHIN TRIAL COURT'S DISCRETION

Mr. Madrigal argues the trial court abused its discretion by denying his motion to vacate the default dissolution decree and associated orders. We disagree.

We review a trial court's decision whether to set aside a default judgment under CR 60(b) for abuse of discretion. *Little v. King*, 160 Wn.2d 696, 702-03, 161 P.3d 345 (2007). Generally, default judgments are not favored because the policy of the law prefers controversies to be decided on their merits rather than by default. *Id.* at 703. But we also value an organized, responsive, and responsible judicial system where litigants

7

comply with court rules.  *Id.* (citing *Griggs v. Averbeck Realty, Inc.*, 92 Wn.2d 576, 581, 599 P.2d 1289 (1979)).  "The fundamental principle when balancing these competing policies is 'whether or not justice is being done.'"  *Id.* (internal quotation marks omitted) (quoting *Griggs*, 92 Wn.2d at 582).

A party moving to set aside a default judgment under CR 60(b)(1) must establish four factors: (1) there is substantial evidence supporting a prima facie defense, (2) the failure to timely appear and answer was due to mistake, inadvertence, surprise, or excusable neglect, (3) the defendant acted with due diligence after notice of the default judgment, and (4) the plaintiff will not suffer a substantial hardship if the default judgment is vacated.  *Little*, 160 Wn.2d at 703-04 (discussing the standard under CR 60(b)(1)); *White v. Holm*, 73 Wn.2d 348, 352, 438 P.2d 581 (1968) (discussing the standard under CR 60(b)(1)).[2]

Application of these four factors is not a mechanical test; whether or not a default judgment should be set aside is a matter of equity.  *Little*, 160 Wn.2d at 704.  The first two factors are primary, while the second two factors are secondary.  *Id.*

---

[2] The *Little* court cited CR 60(b)(1), not CR 55(c).  CR 55(c)(1) provides: "For good cause shown and upon such terms as the court deems just, the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with rule 60(b)."  The four factors set forth above are an amalgam of CR 55(c)'s "good cause" standard and CR 60(b)(1)-(11)'s other standards.

In both *Little* and *White*, the defendant sought to vacate the default judgments

under CR 60(b)(1), which permits relief based on mistake, inadvertence, surprise, and

excusable neglect. Here, Mr. Madrigal seeks to vacate the default dissolution decree and

associated orders under CR 60(b)(11), which—according to one published case—permits

relief based on the trial court having incomplete, incorrect, or conclusory factual

information. *See Caouette v. Martinez*, 71 Wn. App. 69, 78, 856 P.2d 725 (1993).

We combine and adjust the first two *Little* factors to align with *Caouette*'s view of

CR 60(b)(11).

> *1.      Mr. Madrigal failed to present a prima facie defense because his assertions fail to show that the trial court's final orders were based on incomplete, incorrect, or conclusory factual information*

In his motion to vacate and on appeal, Mr. Madrigal relies on CR 60(b)(11) and

argues there are three aspects of the final default orders that warrant setting aside the

default dissolution decree and associated final orders. We review his argument in light of

CR 60(b)(11), the basis of his motion to vacate. As noted above, CR 60(b)(11) permits

vacation of a default judgment based on incomplete, incorrect, or conclusory factual

information. *Caouette*, 71 Wn. App. at 78.

Mr. Madrigal  argues the trial court gave the marital interest in the duplex to Ms. Madrigal and the debt to him.  It did not.  But even if it did, this is not a basis for vacating the property award under CR 60(b)(11).

He also argues the trial court's property award was based on incorrect information about the marital equity in the duplex.  He asserts he had $60,000 of equity in the duplex. We note that Mr. Madrigal's assertion is unsupported by any document.  We further note that his burden was to provide "substantial" prima facie evidence of a defense, not simply prima facie evidence.  Had the trial court known nothing about Mr. Madrigal, this unsupported assertion might be sufficient to meet his burden.  But the trial court knew that Mr. Madrigal violated court orders frequently and justifiably discounted his unsupported assertion.  In doing so, it acted within its discretion.  We conclude that Mr. Madrigal's unsupported assertion that he had $60,000 of equity in the duplex was insufficient to show that the property award was based on incomplete, incorrect, or conclusory factual information.

He lastly argues the parenting plan's prohibition of any contact with his son is inequitable.  This is not a basis for vacating the parenting plan under CR 60(b)(11).  But even if we rephrased his argument to align it with CR 60(b)(11), the record is replete with evidence that Mr. Madrigal posed a significant threat both to Ms. Madrigal and their son.

This threat likely would continue until Mr. Madrigal ceased using illegal drugs and obtained counseling. There is no record that he did either. We conclude the trial court's parenting plan was not based on incomplete, incorrect, or conclusory factual information.

>    2.    *Mr. Madrigal acted with due diligence after learning of the default dissolution decree and associated orders*

Mr. Madrigal moved to set aside the default judgment approximately one week after he learned the final papers were entered. In doing so, he acted with due diligence.

>    3.    *Granting the motion to vacate would not have caused Ms. Madrigal substantial hardship*

The only hardship Ms. Madrigal would have suffered if the default judgment was vacated is the expense of a trial. This is not the type of hardship that courts have deemed "substantial." *Ha v. Signal Elec., Inc.*, 182 Wn. App. 436, 455, 332 P.3d 991 (2014).

Here, the first factor—which combines the first two *Little* factors—weighs against setting aside the default judgment, while the second and third weigh in favor. The first (combined) factor is the primary factor, and the second and third are secondary. For that reason, we conclude that the trial court did not abuse its discretion by refusing to vacate the default dissolution decree and associated final orders.

C.     NO CONSTITUTIONAL VIOLATION OF PARENTAL RIGHTS

Mr. Madrigal contends the parenting plan denies him contact with his son in violation of his constitutional right to parent. We disagree.

Parents have a long-established fundamental right to control the upbringing of their children. *See Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923). That right is protected by the Fourteenth and Ninth Amendments to the United States Constitution. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). The right, however, is not absolute. Washington "allow[s] state interference with parents' rights to raise their children only where the state seeks to prevent harm or a risk of harm to the child." *In re Custody of Smith*, 137 Wn.2d 1, 18, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion).

Accordingly, RCW 26.09.191 mandates parenting plan limitations on a parent's rights in circumstances where that parent poses a risk of harm to their child: "The parent's residential time with the child *shall* be limited" if the court finds the parent has committed acts including abusing a child or domestic violence. RCW 26.09.191(2)(a) (emphasis added). The court may also "preclude or limit any provisions of the parenting plan" if there are other potentially harmful factors, including "other factors or conduct as the court

12

expressly finds adverse to the best interests of the child." RCW 26.09.191(3)(g). Here, the record shows that J.M. was terrified that his father would kill him and his mother. This fear was due to Mr. Madrigal's drug use, assaultive behaviors, and past threats. The record supports the parenting plan entered by the court.

Mr. Madrigal contends that the parenting plan permanently prevents him from having any parental relationship with his son. We disagree. Mr. Madrigal has the option of filing a motion to modify the parenting plan. His motion will likely fail until he can establish that he no longer uses illegal drugs and no longer poses a risk of harm to his son. Perhaps this will provide him incentive to undergo drug testing and counseling, both of which were previously ordered by the trial court.

D.    ATTORNEY FEES AND COSTS

Ms. Madrigal requests attorney fees and costs on appeal. An appellate court has the discretion to order a party to pay the other party's attorney fees and costs associated with an appeal of a dissolution action. RCW 26.09.140. Ms. Madrigal filed a financial affidavit that establishes her need and Mr. Madrigal's ability to pay. Subject to her compliance with RAP 18.1, we award Ms. Madrigal her reasonable attorney fees and costs.

No. 37830-6-III
*Marriage of Madrigal*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____      _____
Siddoway, A.C.J.                                          Fearing, J.

14